IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.  ) | No. 1:17cr188 |
| ) | |
| ANTHONY WILLIE, ) | |
| ) | |
| Defendant.  ) | |

**<u>UNITED STATES' POSITION ON SENTENCING</u>**

The United States of America, through undersigned counsel and in accord with 18 U.S.C. § 3553(a) and the U.S. Sentencing Commission Guidelines Manual ("U.S.S.G." or "Guidelines"), hereby provides its position with respect to sentencing for defendant Anthony Willie ("defendant" or "Willie") in the above-captioned case. Willie was a long-standing public official at the Virginia Department of Transportation ("VDOT") who, along with his co-defendant Kenneth Adams ("Adams"), another VDOT official who was his subordinate, repeatedly abused his position of trust by demanding and accepting bribe payments from private contractors in exchange for steering snow removal work to them during the winter months.

For a period of multiple years, Willie corrupted the process by which the Commonwealth of Virginia obtains critical services to clear its roads and highways during and after winter snowstorms. He manipulated his discretionary authority under that system for his own personal gain, all to the detriment of the private snow removal contractors in the Burke, Virginia area, the citizens of the Commonwealth, and other officials and employees of VDOT. Moreover, Willie taught Adams the process of soliciting and receiving bribe payments from contractors, and he encouraged Adams to do so while he was Adams's direct supervisor. To make matters worse,

1

Willie abused controlled substances, including alcohol and cocaine, while on the job at VDOT and even solicited and received cocaine from other VDOT employees, such as Adams, and from VDOT contractors. *See, e.g.*, Exhibit 1 (photograph of Willie snorting cocaine while at VDOT).

For all of these reasons, the United States requests that this Court adopt the findings of the Pre-Sentence Investigation Report ("PSR"), which indicates that the appropriate Guidelines range with respect to incarceration for defendant Willie is 151 to 188 months. Based on that advisory Guidelines range and the relevant § 3553(a) factors, the United States respectfully requests that the Court impose a sentence of incarceration at the low end of the advisory Guidelines range. The government further requests that the Court impose a period of supervised release of three years and enter a consent order of forfeiture in the amount of $221,720.00,[1] as agreed by the parties.

Such a sentence — while significant — would be sufficient but not greater than necessary to fulfill the purposes of sentencing in this case, including avoiding unwarranted sentencing disparities with Adams, who was sentenced to 64 months of incarceration *after* receiving the benefit of a § 5K1.1 motion. It would appropriately capture the seriousness of the defendant's repeated criminal offenses of soliciting and accepting bribes as a public official and would promote respect for the law. And perhaps most importantly, a meaningful term of incarceration, beyond that imposed on co-defendant Adams, is also warranted in this case to provide general deterrence of bribery schemes by other public officials in similar supervisory positions of trust. Honest services fraud schemes like this one are, by their very nature, clandestine and typically known only to a limited number of like-minded and corrupt individuals. Because public corruption is often quite difficult to detect but carries significant costs for the public's respect and trust in their

---

[1] This figure is based upon the amount of cash bribes that Willie received from multiple snow removal contractors from 2011 through 2017. As the PSR notes, Willie's involvement in the various bribe schemes lasted longer than that of Adams. *See* PSR ¶ 63.

government and its officials, it is in the interest of justice that public officials like Willie be punished with significant terms of incarceration to act as a general deterrent and to help restore the general public's faith in its civic institutions.

## I. Factual Background

From 1990 through 2017, defendant Willie served as a public official employed by the Virginia Department of Transportation. Beginning in or about 2011 and continuing until his termination in September of 2017, Willie was the Superintendent of Maintenance for VDOT's Burke Area Headquarters ("AHQ"). In that role, he was the highest-ranking public official at the Burke AHQ and directly supervised Adams and other VDOT employees. And during the winter months, Willie directed and controlled the VDOT Burke AHQ's operations relating to the provision of critical snow removal services, including snow plowing and pre-snowstorm road treatment, to help clear the Commonwealth's public roads and highways.

In light of his position of trust, Willie possessed significant power and authority over his employees and the private contractors who had been approved to plow snow by VDOT, particularly during snow emergencies. As this Court already recognized when sentencing defendant Adams, the Superintendents and Supervisors of the local VDOT AHQs enjoy broad discretion during winter snowstorms to decide which pre-approved private contractors to call in to provide snow removal services. The Superintendent and/or Supervisor from the AHQ that calls in a particular contractor's services must also sign off on all invoices that the contractor later submits to VDOT for payment. And because VDOT's snow removal contracts can be highly lucrative — at times allowing contractors to bill the Commonwealth for hundreds of thousands or even millions of dollars worth of snow removal work during a single large snowstorm — this discretion gives AHQ Superintendents like Willie significant power to dictate the fortunes of the private

contractors. In addition, because Willie and Adams were responsible for reviewing and signing off on each invoice, they knew which contractors would receive large payments from VDOT. This unique position of trust enabled Willie and Adams to target certain contractors who they believed would be more willing or able to make bribe payments to them in exchange for preferential treatment.

The evidence collected during the government's investigation establishes that the defendant was well aware of the significant power and responsibilities that his official position conferred on him. But rather than living up to those responsibilities, the defendant exploited them. During one court-authorized intercepted conversation on January 30, 2016, with a VDOT contractor who removed snow from the driveway of his personal residence, Willie described himself as a "soldier" and a "businessman." Willie bragged: "I know the system and believe me, I am not going to fail as superintendent." During the same call, Willie summed up his general attitude about his position: "I take care of people who take care of me." But what Willie failed to recognize was that by taking care of the people who took care of him (*i.e.*, by setting up a "pay to play" scheme in Burke), he was abusing his position of trust and, ultimately, failing as a Superintendent to provide honest services to VDOT, the Commonwealth, and other snow removal contractors who had *not* been corrupted into paying bribes.

As the PSR and the defendant's Statement of Facts recount, beginning in at least 2011, Willie and Adams conspired with each other and with multiple private contractors to fundamentally corrupt the entire process for awarding snow removal work in the Burke area by soliciting and accepting bribe payments. Willie repeatedly demanded and accepted bribes during the relevant years from at least three contractors who have also already entered guilty pleas in this case (Rolando Alfonso Pineda Moran, Shaheen "Shane" Sariri, and John Williamson), as well as

from several other as-yet-uncharged individuals.[2] Each of the charged contractors assented to requests from Willie and Adams that they pay bribes in the form of cash or check payments. The cash bribe payments consisted of thousands of dollars at a time and were often made during secret meetings at off-site locations, such as a McDonald's restaurant in Burke, an Outback Steakhouse in Fairfax, and the parking lot of a Giant grocery store in Centreville. *See, e.g.*, Exhibit 2 (photograph of lunch meeting between Willie, Adams, and Sariri at Outback Steakhouse). In addition to those cash bribes, Willie also accepted checks for tens of thousands of dollars from another as-yet-uncharged contractor, made payable to Willie's wife. The checks falsely stated they were for services that Willie's wife had never provided. And Willie then involved his wife in his crimes by having her cash those checks.

Each of the bribes in this case was explicitly paid in exchange for Willie and Adams exercising their official authority to steer snow removal work to the private snow removal contractors and then signing off on their VDOT invoices. And the defendant was entirely unabashed about this corrupt conduct, speaking freely openly with his co-conspirator Adams about approaching contractors for bribes. In some cases, Willie even displayed a willingness to have VDOT pay contractors for work that they had not actually performed, or had not performed well. For example, during one meeting on February 3, 2016, Willie had a discussion with a Confidential Human Source ("CHS") regarding approaching certain contractors for bribes:

Willie: These m----- f------ cutting out some big bucks, huh?

CHS: Hell, yeah, they cutting out some money, man. Hell, yeah, they cutting.

---

[2] In addition to the traditional bribe payments in the form of cash or checks, other individuals also paid bribes to Willie and Adams in the form of other things of value, including tickets to Redskins games, gift cards, food and drink, and goods and services such as vehicle repairs, free weekends at a vacation beach house, and snow removal work at Willie's personal residence.

      Willie:        I'm gonna tell A---, too. A--- gonna give us, I'm gonna see what his invoice is, but that m----- f----- gonna give us some f------ money because I kept them trucks, two trucks come in two days. I kept them on the f------ clock. I'm gonna get that m----- f----- to give us a couple thousand dollars a piece. . . .

      Willie:        In fact, I'm gonna say something to G----, too, man, cause G----, I kept five of his trucks, that m----- f----- wasn't really doing nothing.

      CHS:        Yeah, I think one of his trucks out there broke down now.

      Willie:        Yeah, I kept, you know, them m----- f-----'s on push time.

Exhibit 3 (excerpt of draft transcript of Feb. 3, 2016 recorded meeting).

The amounts of the bribe payments also evolved over time, as Willie and Adams grew emboldened and re-approached the contractors to demand increased payments. *See, e.g.*, Exhibit 4 (excerpt of draft transcript of Feb. 10, 2016 recorded meeting, in which Willie discussed demanding increased payments from contractors Pineda and Sariri). And at least one contractor, Pineda, claimed that he did not report the bribery scheme to law enforcement because Willie had threatened to "kill a snitch" and he feared retribution from Willie or his associates.

Overall, during the six years that he spearheaded this bribery scheme, Willie personally received approximately $221,720.00 in cash bribe payments from the three contractors who admitted to being his co-defendants in this case. Moreover, on top of his long-running criminal conduct involving honest services fraud, Willie also possessed, used, and sought to buy cocaine from other VDOT employees and contractors. And during interviews with law enforcement, Adams admitted that he had distributed controlled substances, including cocaine, to Willie on multiple occasions.

    **II.**    **Guidelines Calculations**

As the Court is well aware, although the Supreme Court rendered the federal Sentencing Guidelines advisory in *United States v. Booker*, 543 U.S. 220 (2005), "a sentencing court is still

6

required to 'consult [the] Guidelines and take them into account when sentencing.'" *United States v. Clark*, 434 F.3d 684, 685 (4th Cir. 2006) (quoting *Booker*, 542, U.S. at 264). Thus, at sentencing a district court "must first calculate the Guidelines range" that applies to the defendant and his offense. *Nelson v. United States*, 555 U.S. 350, 351 (2009); *see also Gall v. United States*, 552 U.S. 38, 49 (2007). The "Guidelines should be the starting point and the initial benchmark," but the sentencing court must also "consider all of the § 3553(a) factors" in determining the appropriate sentence. *Nelson*, 555 U.S. at 352; *see also Clark*, 434 F.3d at 685.

Here, the United States asks the Court to adopt the PSR's findings, to which the defendant has also not objected. The PSR correctly calculated the applicable offense level for this defendant as follows:

| | |
|---|---:|
| <u>Base Offense Level</u> (for public official) (§§ 2X1.1 and 2C1.1(a)(1)): | 14 |
| <u>Enhancements:</u> | |
| Losses between $1.5 and $3.5 million (§§ 2C1.1(b)(2) and 2B1.1(b)(1)(I)) | +16 |
| Offense involved more than one bribe (§ 2C1.1(b)(1)) | +2 |
| Organizer or Leader (§ 3B1.1(a)) | +4 |
| Acceptance of Responsibility (§ 3E1.1(a)) | -2 |
| Acceptance of Responsibility (§ 3E1.1(b))[3] | -1 |
| **<u>Total Offense Level</u>** | **<u>33</u>** |

---

[3] The United States agrees with the PSR that the defendant qualifies, pursuant to U.S.S.G. § 3E1.1(a), for a two-level reduction in his offense level. In addition, the defendant timely notified the United States of his intention to plead guilty, thus permitting the United States to avoid preparing for trial and to allocate its resources more efficiently. Accordingly, the United States hereby moves, pursuant to § 3E1.1(b), to decrease the defendant's offense level by one additional level.

According to the PSR, in 2005, Willie was arrested and pleaded guilty to Driving Under the Influence ("DUI"), but after an appeal to the Circuit Court in Culpeper, Virginia, he later pleaded guilty to a lesser, amended charge of reckless driving. As a result of this prior conviction, the defendant's criminal history category is II. When combined with his total offense level of 33, this results in an advisory Guidelines range of 151 to 188 months of incarceration.

By contrast, in his PSR, co-defendant Adams was in Criminal History Category I and had a total offense level of 31, resulting in a significantly lower advisory Guidelines range of 108 to 135 months. The disparity in Willie and Adams's Guidelines ranges is attributable in large part to the higher losses for which Willie is being held accountable, in light of his longer period of participation in this bribery scheme. And notably, in contrast to defendant Adams, the government has not yet moved this Court to adjust defendant Willie's Guidelines range, although it may (or may not) do so in the future.

### III. Section 3553(a) Factors

As the Court is also well aware, after calculating the applicable Guidelines, a sentencing court must then consider that Guidelines range, as well as the sentencing factors set forth in § 3553(a), and determine a sentence that is appropriate and reasonable for the individual defendant. *Nelson*, 555 U.S. at 351; *see also United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). With respect to § 3553(a)'s enumerated factors, of particular relevance here are the nature and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense, the history and characteristics of the defendant, the need to avoid unwarranted sentencing disparities, and the need to promote respect for the law and afford adequate general deterrence to similar criminal conduct. *See* § 3553(a)(1), (a)(2)(A), (a)(2)(B), (a)(7). As explained below, based on

those factors, a sentence at the low end of the applicable Guidelines range is warranted, appropriate, and reasonable for this defendant.

      A.      *A significant sentence of 151 months of incarceration is necessary based on the nature, circumstances, and seriousness of the defendant's offenses.*

Defendant Willie engaged in an unquestionably serious and protracted public corruption scheme spanning a period of at least six years — essentially the entire time that he served as the VDOT Burke AHQ Superintendent. It is undeniably a serious offense anytime a public official exploits his official position for his own private gain by demanding and receiving bribe payments from private contractors in exchange for awarding them work. And in this case, even if much or all of the snow removal work in this case was eventually performed by the corrupt contractors who bribed Willie and Adams, the bribery scheme itself caused incalculable harm to the public's faith in VDOT, the Commonwealth, and the honest functioning of its public officials. As another Court recently stated:

> Bribery cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. Putting aside the financial havoc it can cause, bribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently. And that harm, though it may at times appear intangible, is real.

*United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014). A substantial sentence is therefore necessary to reflect the severe harm caused by the defendant's crimes.

The defendant's offense was even more serious, however, because far from being a one-time lapse in judgment, it was evidently a way of life for him. The defendant made numerous conscious criminal decisions over the lengthy period of his participation in these honest services fraud schemes, choosing to exploit his authority as a VDOT Superintendent to extract cash and other bribe payments from at least three separate contractors charged in this case, and repeating his corrupt conduct during snow season after snow season. Moreover, he did so in secret,

undertaking numerous efforts to avoid detection by law enforcement and his employer, including receiving bribe payments in cash during secret meetings at off-site locations. And he recruited others — including Adams, his deputy and second-in-command — into the scheme, thereby causing them to become convicted felons as well.

The defendant admits that he knew what he was doing was wrong, but he never stopped. Instead, he escalated his conduct over time, requesting increased bribe payments from more and more contractors. *See* Exhibit 4. In so doing, he and Adams worked together to line their own pockets while betraying the public's trust, undermining the rule of law, and preying upon snow removal contractors in vulnerable financial positions. The end result was that the defendant corrupted one of the most important aspects of VDOT's operations during winter months: namely, the awarding of snow removal work to clear the Commonwealth's highways and roads during and after snowstorms.

The defendant's long-running criminal conduct enabled him to enrich himself to the tune of several hundreds of thousands of dollars and led to the tainted awarding of millions of dollars' worth of snow removal work to multiple VDOT contractors, all at the expense of undercutting the public's trust in a critical public service. And it is clear that absent the intervention of law enforcement, the defendant and Adams would have continued — in their own words — "padding [their] pockets" with bribe payments from contractors in the Burke area for the foreseeable future. Accordingly, given the length, scope, and seriousness of the defendant's criminal conduct, the United States submits that there is no reason to deviate below the applicable advisory Guidelines range for this defendant's sentence.

> B. *A significant term of imprisonment at the low end of the Guidelines range is also necessary in light of the defendant's personal history and characteristics.*

A bottom of the Guidelines sentence — while admittedly quite significant — is also necessary in light of the defendant's personal history and characteristics. The defendant is now 55 years old, and he worked for VDOT for several decades, most recently earning a salary of $77,271. Willie held a position of significant authority and responsibility as a Superintendent at the VDOT Burke AHQ. He was well aware of his obligations to his employer and to the citizens of Virginia to discharge his duties honestly and faithfully. However, Willie's view of himself, his job responsibilities, and his duty of loyalty to the public evidently eroded and became corrupted over time. The defendant came to see himself not as a public servant but as a "businessman," and rather than uphold the important ideals of public service, he chose to abuse his position of trust to enrich himself over a period of many years.

In addition to his bribery schemes, the record reflects that the defendant was certainly less than a model VDOT employee in other respects, even though he was charged with supervising the activities of others at VDOT. Like his co-conspirator Adams, the defendant also abused alcohol and dangerous controlled substances like cocaine, and he even further undermined the public's trust in VDOT's officials by doing so at his job site and/or while "on the clock" for VDOT. During one such incident, Willie was actually recorded snorting cocaine behind closed doors in his VDOT office. *See* Exhibit 1. As the PSR notes, the defendant was also placed on administrative leave from VDOT for 3 to 4 months for issues relating to being intoxicated while on the job and refusing to take a breathalyzer test. *See* PSR ¶ 104. But that disciplinary action, and his reported attendance at counseling in October 2016, apparently did nothing to deter or slow down his criminal behavior. Moreover, during his employment, VDOT indicated that the defendant was "not reliable" due to "excessive leave usage and lack of attendance for work." And his employment was ultimately

terminated due to "accumulation of written notices (3)," "misuse of State equipment for more than incidental and occasional use," and of course, his arrest in this case on August 31, 2017.

Moreover, during snow emergencies and when VDOT and the general public most needed level-headedness and good judgment from its Superintendent of Maintenance, Willie acted as if such events were a license to party and put his own personal needs and desires above his professional duties. One such incident is particularly shocking: On February 15, 2016, there was a snow event and Willie determined that he needed to get a hotel room in the Northern Virginia area for the night. During a series of court-authorized intercepted calls, Willie contacted VDOT contractor A.G. and a VDOT employee, asking them to send various women to his hotel room. During one highly troubling conversation with a female snow plow driver, Willie attempted to manipulate her to get what he wanted, saying:

      Willie:      So, it's up to you to come see me, you make the choice. ***Don't bite the hand that feeds you. Because I do extra for who you working for and make sure you are going to get yours.*** Money's not everything you hear what I said?

      Female:      So, you are trying to tell me that if I don't go to see you, I could lose my job? Is that what you are trying to tell me?

      Willie:      No, no, no, no, hell, no. I ain't no sob person. No, no, no, no, no. You'll never lose your job because of that. I'm a very solid man, no. But I'd like for you to come see me.

In addition, unlike every other defendant to have been charged in this case, defendant Willie is in Criminal History Category II, rather than Criminal History Category I. His criminal history is based on a prior alcohol-related conviction for reckless driving in 2005, when he was 42 years old. But despite being sentenced to several months of incarcerations, that criminal sentence did not successfully deter the defendant from further substance abuse or further criminal behavior. Defendant Willie is therefore *not* an otherwise entirely law-abiding citizen whose conduct in this case could be regarded as an aberration. And although the circumstances that led the defendant

into this federal courtroom are certainly the most serious to date, it is noteworthy that the defendant has been convicted and sentenced to a term of incarceration in the past, yet that sentence apparently did not have a meaningful effect on him. All of this suggests that stronger medicine is warranted in this case to finally make an impression on the defendant.

In sum, because the defendant committed his crimes as an adult, when he had the maturity and life experience to make lawful choices, his personal history provides no reason to deviate below the applicable Guidelines range. At the same time, however, the government submits that a sentence at the low end of the advisory Guidelines range would be appropriate in this case, in recognition of the fact that the defendant has accepted responsibility for his wrongdoing and displayed a willingness to cooperate with the government's ongoing investigation.

> C. *A significant term of incarceration much greater than the 64 months imposed on cooperating co-defendant Adams is necessary to avoid unwarranted disparities in sentences.*

A meaningful period of incarceration within but at the low end of the applicable Guidelines range is also necessary for defendant Willie to avoid unwarranted disparities in sentences between him and the only other similarly situated public official: Adams, who was sentenced to 64 months of incarceration. But notably, that sentence was imposed only *after* Adams received a significant downward variance for reasons discussed in the government's sealed filing in that matter. And as previously noted, Willie participated in the bribery scheme for longer than Adams did, so his conduct certainly merits a longer sentence.

Willie also originally recruited Adams into the bribery scheme, and he was Adams's boss and direct supervisor at VDOT. He was accordingly by far the most culpable individual in this case. Indeed, it appears likely that none of the private contractors would ever have become involved in this scheme had Willie and Adams not approached them and convinced them to pay

bribes in exchange for snow removal work. And even Adams himself would likely never have become ensnared in this scheme had the defendant not personally recruited him into the fold. Defendant Willie is thus not only responsible for his own criminal conduct, but in a very real sense, he was the proximate cause of five other co-defendants in this case becoming convicted felons. The United States submits that the sentence imposed on Willie should therefore be the highest by far of that imposed on any other co-defendant, and a sentence of more than double what Adams received would be fully commensurate with Willie's conduct and relative culpability.

      D.    *A significant term of 151 months of incarceration is necessary to promote respect for the law and afford adequate general deterrence of similar public corruption schemes.*

The need for general deterrence also warrants a significant sentence. Indeed, general deterrence is perhaps the most important consideration in an extensive public corruption case like this one. Crimes like this one are unfortunately highly appealing, as they can yield significant benefits for their perpetrators. They are also often quite difficult to detect due to the participation of public officials like Willie who wield broad, largely unmonitored discretion, as well as the use of secretive mechanisms like cash payments handed off under the table. The very factors that enable the criminal conduct to occur thus also frequently aid in its concealment. And courts have recognized that "[a]s a practical matter," such "efforts to conceal demand greater punishment, because they make it less likely that authorities will detect the scheme." *United States v. Shortt*, 485 F.3d 243, 251-251 (4th Cir. 2007).

Moreover, as noted above, crimes like this one require conscious, repeated decision-making, and defendants like Willie make conscious, repeated decisions to act illegally because, simply put, they feel they are entitled to do it and they believe the personal financial benefit to them outweighs the likelihood of getting caught and the duration of any potential imprisonment.

A significant term of incarceration is thus necessary to serve as a counter-weight to that calculus, thereby ensuring that other public officials who serve in similar positions of trust will think twice before falling prey to similar temptations. *See, e.g.*, *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (finding that crimes that are "rational, cool, and calculated" rather than "crimes of passion or opportunity" are "prime candidates for general deterrence") (citation omitted).

A meaningful term of imprisonment — *i.e.*, something at the low end of the advisory Guidelines range— is necessary here to send a message to others at VDOT, and to other public officials more generally, that crimes like this one will be met with significant punishment. In short, such a sentence is necessary to protect the integrity of the government's systems and safeguard the public's faith in its institutions by deterring future criminal conduct by similarly situated government officials.

### IV.  Forfeiture

The United States also requests that the Court enter a Consent Order of Forfeiture for a money judgment, as agreed by the parties, in the amount of $221,720, which represents the bribe payments that Willie personally received. The proposed order is attached to this sentencing position paper as Exhibit 5.

### V.  Conclusion

For the reasons stated, the United States requests that this Court impose a term of incarceration of 151 months, followed by a period of supervised release of three years. In addition, the United States requests that this Court enter a consent order for a forfeiture money judgment in the amount of $221,720.

Respectfully submitted,

Tracy Doherty-McCormick
Acting United States Attorney


By: _____/s/_____
Kimberly Riley Pedersen
Samantha P. Bateman
Counsel for the United States
Assistant United States Attorneys
U.S. Attorney's Office
2100 Jamieson Ave
Alexandria, VA
Phone: 703-299-3700
Fax: 703-299-3981
Email: Kimberly.Riley.Pedersen@usdoj.gov
        Samantha.Bateman@usdoj.gov

16

## CERTIFICATE OF SERVICE

  I hereby certify that on February 10, 2018, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing ("NEF") to all counsel of record.

          By: _____/s/_____
             Samantha P. Bateman
             Counsel for the United States
             Assistant United States Attorney
             U.S. Attorney's Office
             2100 Jamieson Ave
             Alexandria, VA
             Phone: 703-299-3700
             Fax: 703-299-3981
             Email: Samantha.Bateman@usdoj.gov